DAVID R. GALISTEL, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Galistel v. Commissioner
Docket No. 7960-71.
United States Tax Court
T.C. Memo 1976-253; 1976 Tax Ct. Memo LEXIS 150; 35 T.C.M. (CCH) 1107; T.C.M. (RIA) 760253; August 16, 1976, Filed David R. Galistel, pro se. [1]
*151 Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the male petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the male petitioners) and such employers. Respondent determined a deficiency in petitioner's 1969 Federal income tax in the amount of *152 $198.63. By amendment to his answer to conform the pleadings to the proof, respondent seeks an increased deficiency in the aggregate amount of $872.95, an increase of $674.32 over the amount determined in the statutory notice of deficiency. The only issue for decision is whether all or any portion of the per diem payments received by petitioner from Dynalectron in 1969 is includible in his gross income for that year under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct an amount equal to all or any portion of the includible per diem payments, as away-from-home travel expenses under section 162(a)(2). FINDINGS OF FACT Petitioner filed his 1969 Federal income tax return with the Internal Revenue Service Center which services the Internal Revenue District that includes Kansas City, Missouri. The record herein does not establish what was his residence at the time he filed his petition in the present case. Petitioner was employed by Dynalectron as a member of two field teams during 1969. That *153 corporation, as well as Lockheed, had a contract with the United States Air Force during that year to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract *154 also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing factilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, *155 shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" *156 meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had *157 no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion o the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most *158 instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock *159 meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their *160 initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. In response to a newspaper advertisement, petitioner was hired by Dynalectron in June 1968 and was assigned to Vietnam for a six months' tour of duty. In early January 1969, Dynalectron brought him back to the United States for a brief leave of absence. In early February, Dynalectron assigned petitioner back to Vietnam for a second six months' tour of duty, at the end of which in early August, the company brought him back to the United States. When asked by Dynalectron if he would accept a third Vietnam assignment, he declined. On August 15, 1969, Dynalectron assigned petitioner to Key Field at Meridian where he remained for the balance of that year, throughout 1970, and until January 30, 1971, when he resigned his position for personal *161 family reasons. Petitioner advised Dynalectron when he was hired in June 1968, that his "actual residence * * * fixed or permanent domicile" was 1708 East 67th Street Terrace North, North Kansas City, Missouri, and that advice was not changed at any time thereafter. That address is the home of petitioner's father. Petitioner, who was born in 1941, was raised in Kansas City. He first left home in 1958 when he enlisted in the Armed Services, where he served until June 1967, when he was discharged in Illinois. He took a job in Waukegan, Illinois, where he remained until the first part of 1968, when he became ill and went to Kansas City to be admitted to a Veterans Hospital there. After being hospitalized for one month, he was discharged. Petitioner recuperated at his father's house until he was hired by Dynalectron in June. Since leaving Kansas City when he entered the service in 1958, petitioner has never worked in Kansas City, and has been there only on furloughs, vacations, leaves of absence, and during his hospitalization and recuperation. He owns no real estate in Kansas City. He did have some papers and personal belongings at his father's house in 1969. Petitioner *162 opened a savings account in a Kansas City bank while he was on his first Vietnam assignment, and he partially financed the purchase of an automobile with a loan from the same bank just prior to going to Meridian. When petitioner was assigned to Meridian, he opened a checking account with a bank in that community. He put Missouri license plates on the car; and when the Illinois operator's permit, which he had obtained at the time of his discharge from the service, expired, he applied for and was issued a Missouri operator's license in early 1969. Petitioner was registered with a Selective Service Board in Kansas City. His 1969 Federal income tax return carried an address in Meridian. Petitioner was unmarried throughout 1969, and lived in furnished rented quarters during the portion of that year after his assignment to Meridian. The record does not show what his living arrangements were in Vietnam. In early 1970, he was married to a young lady from Stonewall, in Clarke County, Mississippi, just south of Meridian, and they were still living in Meridian at the time of trial. Petitioner received per diem payments totalling $3,644 from Dynalectron in 1969 -- $2,557 in respect *163 of his assignment in Vietnam in that year and $1,107 in respect of his assignment in Meridian. He included none of those amounts in income on his 1969 return. In his statutory notice of deficiency, respondent determined that the $1,107 was includible in petitioner's income under section 61. By amendment to his answer to conform the pleadings to the proof, respondent asserts that the $2,557 is also includible in petitioner's 1969 gross income. OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 are includible in his gross income for that year. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" as evincing a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion" ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); *164 and thus they were gains. The Code contains no provision exempting per diem payments from taxation. Petitioner cannot bring himself within the provisions of section 911(a) or (b) -- providing exempt status for certain income earned in foreign countries -- insofar as the per diem in respect of his Vietnam assignment is concerned. Manifestly, then, the respondent was correct in including in petitioner's gross income the entire amount of the per diem payments which he received in 1969. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) an amount equal to all or any portion of the includible per diem, as expenses of travel while away from home in pursuit of his trade or business as an employee of Dynalectron, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, *165 had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses; (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties are apart on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to *166 expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points emerge: Were petitioner's assignments temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? With respect to the first point, respondent concedes that petitioner's 1969 Vietnam assignment was tempoary. However, he contends that the Meridian assignment was indefinite. It is not believed that that contention is meritorious. Bearing in mind the contractual arrangements between Dynalectron and the Air Force and the employment arrangements between field team members and Dynalectron and petitioner's employment experience with Dynalectron, and viewing matters as of December 31, 1969, when petitioner's Meridian assignment was only some 4 1/2 months old, it is believed that his 1969 Meridian assignment should likewise be regarded as temporary. With respect *167 to the second point, whether petitioner maintained two places of abode during each assignment and thereby incurred those additional and duplicate living expenses to mitigate the burden of which is the aim and purpose of the deduction afforded by section 162(a)(2), it is believed that the answer must be that he did not. It was in Vietnam and in Meridian that petitioner ate, slept, worked -- in short, made his home -- and not in Kansas City or any other place. During his two assignments petitioner incurred his only living expenses in those two localities where he was assigned, and he therefore did not incur or bear the burden of any additional or duplicate living expenses. In 1969, petitioner's ties to Kansas City were too tenuous and insubstantial for that city to be regarded as his tax home. In summary, petitioner's places of employment, Vietnam and Meridian, must be regarded as his tax homes while he was on assignment to them, and the result must be that petitioner was at, not away from, his tax homes during such assignments. Accordingly, petitioner should not be entitled to any deduction for away-from-home travel expenses under section 162(a)(2) for 1969. Decision should be *168 entered for respondent for the increased deficiency sought in his amendment to answer. In accordance with the foregoing, Decision will be entered for respondent. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioner at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.